# Illinois Official Reports

## Appellate Court

---

### *Castillo v. Stevens*, 2019 IL App (1st) 172958

---

| | |
|---|---|
| Appellate Court Caption | LUDGARDA R. CASTILLO and RICHARD CASTILLO, Plaintiffs, v. JEREMY STEVENS, M.D., and THE CENTER FOR ATHLETIC MEDICINE, LTD., Defendant-Appellees (Ludgarda R. Castillo, Plaintiff-Appellant). |
| District & No. | First District, Second Division<br>No. 1-17-2958 |
| Filed | October 22, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-5118; the Hon. Thomas V. Lyons, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Adam P. Merrill, of Sperling & Slater, of Chicago, for appellant.<br><br>Michael D. Krause and Gregory V. Ginex, of Bollinger Connolly Krause, LLC, of Chicago, for appellee Jeremy Stevens.<br><br>Kevin T. Martin, Catherine Basque Weiler, and Nathaniel S. Widell, of Swanson, Martin & Bell, LLP, of Chicago, for other appellee. |

| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment and opinion. |

## OPINION

¶ 1      Plaintiff, Ludgarda R. Castillo, appeals from a jury's verdict in favor of defendants, Dr. Jeremy Stevens and The Center for Athletic Medicine (CAM), on plaintiff's claim of medical negligence. On appeal, plaintiff argues that the trial court erred in (1) granting defendants' motion for directed verdict on her informed consent claim, (2) conditioning plaintiff's calling her expert live at trial on her payment of fees and costs to defendants, (3) allowing defendants to question a witness about whether syphilis could cause plaintiff's complaints of pain without a definitive diagnosis of syphilis, and (4) precluding plaintiff from cross-examining Stevens on certain publicly available literature related to the procedure performed on plaintiff. For the reasons that follow, we affirm.

¶ 2                             BACKGROUND

¶ 3      The record in this matter is voluminous, and only small portions of it are relevant to the issues raised on appeal. Accordingly, we will recite here only those facts necessary to an understanding of the factual background of this case. Any additional facts necessary to the disposition of the issues raised on appeal will be discussed in our analysis.

¶ 4      In 2004, following complaints of right knee pain, plaintiff was diagnosed with a 17-degree valgus deformity of her right femur, which meant that her femur was misaligned, such that plaintiff was "knock-kneed." Her condition resulted in an excess amount of pressure on the outside of plaintiff's knee. At that time, plaintiff also displayed signs of arthritis in her right knee. To correct the valgus deformity and alleviate plaintiff's pain, Stevens, an orthopedic surgeon who practiced with CAM, performed a right distal femoral open wedge osteotomy, a procedure in which the surgeon cuts part way through the femur to create a wedge opening, allowing the femur to be realigned. Once the proper alignment is achieved, the surgeon secures the femur with hardware and fills the opening with a bone graft to promote healing between the two ends of the femur. In plaintiff's surgery, Stevens intended to use a Puddu plate to secure plaintiff's femur. Because, however, the medial cortex—the side of plaintiff's femur opposite the wedge opening—fractured during the procedure, Stevens had to switch his plans and instead used a condylar blade plate to secure the two sections of plaintiff's femur. Stevens testified at trial that he did not place the condylar blade plate in a position parallel to plaintiff's knee because doing so would have placed her knee in a 5-degree valgus position and would not have achieved the goal of taking the pressure off plaintiff's outside knee. Instead, he installed the condylar plate obliquely, so as to achieve the desired degree of correction. He also testified that at the completion of the procedure, plaintiff's femur was properly aligned to shift plaintiff's weight bearing load more to the inside of her knee.

¶ 5      Sometime after the procedure, plaintiff was diagnosed as having a nonunion of the femur. In other words, the two sections of plaintiff's femur did not heal together. To correct this condition, plaintiff underwent a revision surgery performed by Dr. Rajeev Garapati. Garapati

testified in his evidence deposition that when he first saw plaintiff in 2005, she had a significant varus deformity in her right leg, *i.e.*, she was now bowlegged on the right. Garapati testified that he did not know the condition of plaintiff's leg immediately following the procedure performed by Stevens, did not know the exact cause of plaintiff's varus deformity, and the varus position of plaintiff's knee could have been a result of the nonunion. He also testified that both nonunions and fractures of the medial cortex are known risks of the procedure performed by Stevens and can and do occur in the absence of negligence on the part of the surgeon. To correct the varus deformity and nonunion, Garapati performed a revision surgery on plaintiff, which included removing the old hardware, placing a new bone graft, realigning the femur, and installing new hardware.

¶ 6 Eventually, plaintiff healed, although she testified that she continues to experience pain and functional limitations and is only able to work with special accommodations.

¶ 7 Dr. Raymond Vance testified via evidence deposition as an expert on behalf of plaintiff. He testified that Stevens deviated from the applicable standards of care in a number of ways. First, Stevens should not have recommended that plaintiff undergo the surgery rather than trying more conservative treatment methods first. He also testified that it was a deviation from the standard of care for Stevens to install the condylar blade plate in an oblique position rather than a parallel position and that Stevens's oblique installation resulted in a 12-degree varus deformity of plaintiff's right knee, the nonunion, and plaintiff's ongoing pain and functional limitations. Vance agreed, however, that had Stevens installed the condylar blade plate in a parallel position, it would have placed plaintiff's knee in a 5-degree valgus position and that if Stevens wanted to place the knee in a slight varus position, he would have to install the plate obliquely. Vance also acknowledged that the fracture of the medial cortex was not a deviation from the standard of care on the part of Stevens because such a complication could occur with any surgeon performing the procedure.

¶ 8 Dr. Sherwin Ho testified at trial as an expert on behalf of defendants. He testified in relevant part that nonunions are known risks of the procedure performed by Stevens, Stevens had nothing to do with the nonunion occurring, and postoperative images following Stevens's procedure showed that the surgery performed by Stevens was a success. He also testified that fractures of the medial cortex happen in about half of such cases and that surgeons typically anticipate and plan for such complications. According to Ho, Stevens complied with the relevant standard of care in offering and performing the surgery.

¶ 9 In addition to alleging that Stevens negligently performed the right distal femoral open wedge osteotomy on her, plaintiff also alleged that Stevens failed to obtain plaintiff's informed consent before performing the procedure in that Stevens failed to advise her of all of the risks and benefits of the procedure and failed to advise her of alternative conservative treatment options. With respect to that claim, plaintiff presented the following evidence at trial.

¶ 10 Plaintiff testified that prior to the surgery, Stevens advised her that the procedure included risks of bleeding, infection, pain, or discomfort. She could not recall anything else that Stevens might have said about the risks of the surgery, although she later testified that Stevens never informed her that there was a risk that the medial cortex could fracture during the procedure. She admitted that there might have been other things that Stevens talked with her about that she did not remember.

¶ 11 Vance testified that it was a deviation from the applicable standard of care for Stevens to recommend the surgical procedure rather than other conservative treatments, such as physical

therapy, medications, or activity modification. He also testified that in order to obtain informed consent from plaintiff, Stevens was required to inform plaintiff that the osteotomy included the risks of nonunion, failure to heal, and fracture of the medial cortex. Vance acknowledged that he was not present for any discussions between Stevens and plaintiff or between Dr. John Theodoropoulos, who assisted Stevens in plaintiff's surgery, and plaintiff. Thus, Vance could not say whether Stevens or Theodoropoulos advised plaintiff of the risks of the osteotomy. He also testified that he had no reason to believe that Stevens would not have obtained proper informed consent from plaintiff.

¶ 12 After plaintiff rested, defendants moved for a directed verdict on plaintiff's informed consent claim. Defendants argued that plaintiff failed to present any expert evidence that Stevens deviated from the relevant standard of care in obtaining informed consent, plaintiff did not present any evidence that she would not have consented to the procedure had all of the risks been properly disclosed, and Vance testified that plaintiff's claimed injuries were caused by the misalignment of the condylar blade plate, not that they were caused by the nonunion or medial cortex fracture. The trial court reserved ruling on the motion, permitting plaintiff's counsel to review the transcript of plaintiff's testimony and defendants to present the testimony of Stevens on the issue of informed consent.

¶ 13 With respect to informed consent, Stevens testified that he did, in fact, inform plaintiff of the risk of nonhealing of the bone. He would not, however, have advised her of specific complications that might occur during the procedure if he could fix them during the procedure, such as a fracture of the medial cortex. He also testified that he discussed alternative conservative treatments with plaintiff but that plaintiff advised him that she did not want the pain and functional limitations to progress. Stevens advised her that without surgery, her arthritis and pain would continue to progress over time.

¶ 14 Theodoropoulos also testified that he would have advised plaintiff of the risk of nonunion, although he did not have any specific recollection of doing so. Ho testified that it was his opinion that plaintiff received informed consent. He based this opinion on a letter Theodoropoulos sent to plaintiff's primary care physician in which Theodoropoulos stated that he advised plaintiff of the risks of the osteotomy, including damage to nerves, arteries, vessels, and tendons; bleeding; infection; other medical problems; death; and possibility that plaintiff's condition may not improve and may get worse. Ho also based his opinion on the consent form that plaintiff signed on the day of the surgery, which stated that plaintiff had been informed of the nature and purpose of the procedure, the medically significant risks and consequences of the procedure, and alternative procedures.

¶ 15 After defendants rested, they renewed their motion for directed verdict. The trial court granted that motion, concluding that there was an abundance of evidence that plaintiff was advised of the risks of the procedure and no evidence that plaintiff would not have consented had she been advised of the risks of which she claims she was not advised.

¶ 16 The jury ultimately entered a verdict in favor of defendants and against plaintiff. Following an unsuccessful motion for a new trial, plaintiff instituted this timely appeal.

¶ 17                                                    ANALYSIS

¶ 18 On appeal, plaintiff argues that the trial court erred in (1) granting defendants' motion for directed verdict on her informed consent claim, (2) conditioning plaintiff calling her expert live at trial on her payment of fees and costs to defendants, (3) allowing defendants to question

a witness about whether syphilis could cause plaintiff's complaints of pain without a definitive diagnosis of syphilis, and (4) precluding plaintiff from cross-examining Stevens on certain publicly available literature related to the procedure performed on plaintiff. We conclude that none of these contentions warrant reversal.

¶ 19                                    Directed Verdict

¶ 20        Plaintiff's first contention on appeal is that the trial court erred in granting defendants' motion for directed verdict on her informed consent claim. "A motion for directed verdict will not be granted unless all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). On review, we must construe all evidence in the light most favorable to the nonmoving party, and we apply a *de novo* standard of review. *Id.*

¶ 21        An informed consent claim consists of four elements:

>        "(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment." *Coryell v. Smith*, 274 Ill. App. 3d 543, 546 (1995).

In granting defendants' motion for directed verdict, the trial court concluded that plaintiff had failed to present any evidence on the second and third elements of her informed consent claim. Plaintiff argues that she presented sufficient evidence that Stevens failed to advise her of the risks of medial cortex fracture and nonunion and that a reasonable person in her position would not have consented to the osteotomy had those risks been disclosed.

¶ 22        We conclude that the trial court correctly granted defendants a directed verdict on plaintiff's informed consent claim because plaintiff failed to present any expert evidence that Stevens failed to comply with the applicable standard of care in advising plaintiff of the risks of the procedure. It is well established in Illinois caselaw that "[t]he failure of the physician to conform to the professional standard of disclosure must be proven by expert medical evidence." *Xeniotis v. Cynthia Satko*, 2014 IL App (1st) 131068, ¶¶ 51, 59; see also *Smith v. Marvin*, 377 Ill. App. 3d 562, 570 (2007); *Guebard v. Jabaay*, 117 Ill. App. 3d 1, 6 (1983); *Magana v. Elie*, 108 Ill. App. 3d 1028, 1032 (1982). Here, although plaintiff presented the expert testimony of Vance establishing the applicable standard of care, *i.e.*, the osteotomy risks that Stevens had a duty to disclose, Vance did not offer any testimony regarding whether Stevens's disclosures complied with that standard of care, *i.e.*, whether Stevens failed to disclose or inadequately disclosed the material risks to plaintiff. Rather, Vance testified that he had no opinion on whether Stevens disclosed the material risks and that he had no reason to believe that Stevens had not. Absent expert evidence on this element, plaintiff could not make out her claim for informed consent, and the trial court did not err in granting defendants' motion for a directed verdict. See *Xeniotis*, 2014 IL App (1st) 131068, ¶ 75 (where the plaintiff's expert affidavit was struck, the plaintiff had no expert testimony to establish that the defendant deviated from the applicable standard of care in the plaintiff's informed consent claim and the defendant was entitled to summary judgment).

¶ 23        We recognize that Vance, having not been present during the discussions between plaintiff and Stevens, would not have any firsthand knowledge of what, exactly, Stevens said to plaintiff regarding the risks of the procedure. The point of the expert testimony on this issue is not to

corroborate plaintiff's testimony regarding what was or was not told to her by Stevens. Rather, the point of expert testimony on this issue is to obtain an expert opinion on whether the warnings that were claimed to have been given satisfied the applicable standard of care. See *id.* ¶¶ 51, 59 ("The failure of the physician *to conform to the professional standard of disclosure* must be proven by expert medical evidence ***." (Emphasis added.)). We see no reason why an expert could not read the parties' depositions regarding what was said during the informed consent discussion and offer an opinion on whether such disclosures complied with the applicable standard of care. After all, experts often rely on the parties' deposition testimony or other evidence to offer their expert opinions on matters occurring outside of their personal knowledge. For instance, medical experts often rely on a patient's and treating doctor's testimony and medical records to assess the patient's claimed symptoms and abilities to determine whether the treating doctor made the correct diagnosis or acted appropriately, even though the expert might never have actually examined or observed the patient's claimed symptoms and abilities or the treating doctor's actions. Moreover, we observe that expert testimony regarding whether a defendant doctor's disclosure adequately informed the plaintiff of the material risks of the treatment would assist the jury in assessing the defendant's alleged breach in situations where some of the language used by the defendant doctor was technical in nature, such that the average person might not be able to assess whether the defendant doctor's warnings encompassed all the necessary risks. See *Ripes v. Schlechter*, 2017 IL App (1st) 161026, ¶ 16 (expert testimony required where assessment of the claim required knowledge, skill, and training in a technical area outside the comprehension of a layperson).

¶ 24    Plaintiff argues that she should not be required to present expert testimony on whether Stevens failed to give adequate warnings of the risks of the osteotomy because the court in *Coryell* held that expert testimony is required in an informed consent claim only to establish the applicable standard of care. Plaintiff misreads *Coryell*. In *Coryell*, the trial court granted summary judgment in favor of the defendants on the plaintiff's informed consent claim on the basis that the plaintiff had not presented any expert evidence demonstrating that the alleged inadequate disclosure proximately caused the plaintiff's damages. *Coryell*, 274 Ill. App. 3d at 545. The appellate court noted that on review, its focus was on the trial court's ruling on the proximate cause element of the plaintiff's claims and that the parties had not raised issues with respect to any other elements of the informed consent claim. *Id.* at 546. Ultimately, the *Coryell* court held that the trial court erred in requiring the plaintiff to present expert evidence on the issue of proximate cause because the jury was equipped to assess whether the alleged undisclosed information would have altered a reasonable person's decision to undergo the treatment. *Id.* at 550.

¶ 25    In so concluding, the appellate court stated, "*In an informed consent action, however, after they [the jury] have been educated as to the information that the physician should have disclosed to the plaintiff (element 1)*, no one is in a better position than the jury to determine whether any alleged undisclosed information would have altered the plaintiff's decision to undergo the proposed treatment had it been disclosed." (Emphasis added.) *Id.* Plaintiff relies on the emphasized language to argue that the *Coryell* court held that expert evidence is only necessary on the first element (the standard of care) of an informed consent claim. This language, however, states no such thing; rather, it simply states that once an expert establishes the applicable standard of care, the jury is equipped to assess whether the alleged undisclosed information would have altered the plaintiff's decision to undergo treatment. At no point was

the *Coryell* court called upon to address the question of whether expert evidence is necessary to establish whether a doctor defendant failed to comply with the standard of care, nor did the *Coryell* court take it upon itself to pass on that question. Rather, the only issue the *Coryell* court addressed was the necessity of expert evidence on the proximate cause element. Accordingly, plaintiff's claim that *Coryell* court overturned existing precedence and affirmatively held that expert evidence in an informed consent case is only needed on the applicable standard of care is without merit. The decision in *Coryell* has no impact whatsoever on the longstanding rule that expert testimony is necessary to establish that the defendant doctor failed to disclose or inadequately disclosed the material risks of the proposed treatment.

¶ 26 Plaintiff also argues that we should not "rewrite informed consent law" by imposing a requirement of expert evidence on the second element of an informed consent claim because such a requirement would effectively prevent proof of the second element except by the testimony of the defendant doctor. We disagree. First, for the reasons discussed above, we are not "rewrit[ing] informed consent law." We are simply following a well-established principle of law. To accept plaintiff's invitation to excuse her from presenting expert testimony on the second element would be to rewrite existing informed consent law. Second, as discussed extensively above, we have no impediment to an expert offering an opinion on whether a defendant doctor's disclosure adequately disclosed the material risks based on the expert's evaluation of the parties' testimony and other evidence regarding what was disclosed.

¶ 27 Because we conclude that plaintiff's failure to present any expert testimony establishing that Stevens failed to disclose or inadequately disclosed the material risks of the osteotomy to plaintiff warranted the trial court's grant of a directed verdict in favor of defendants, we need not address plaintiff's claim that she presented sufficient evidence that a reasonable person would not have consented to the osteotomy had Stevens's disclosure been adequate. Nevertheless, we pause to address the fatal deficiency in plaintiff's contention in this regard.

¶ 28 Plaintiff's primary issue with the trial court's ruling in this respect is that the trial court focused on the lack of explicit testimony from plaintiff that she would not have consented to the osteotomy had Stevens's disclosure been adequate. Plaintiff is correct that this element is assessed according to an objective standard, rather than a subjective one:

> "If disclosure would not have changed the decision of a reasonable person in the position of the patient, there is no causal connection between nondisclosure and his post-operative condition; if, however, disclosure would have caused a reasonable person in the position of the patient to refuse the surgery or therapy, a causal connection is shown." *Guebard*, 117 Ill. App. 3d at 10.

The fatal flaw with plaintiff's position is that the record evidence she cites in support of her claim that a reasonable person would not have consented to the procedure with adequate disclosure does not shed any light on what a reasonable person might have done. Rather, the evidence on which plaintiff relies relates only to what information was provided to plaintiff. Other than making the conclusory statement that this constituted evidence that a reasonable person would not have gone forward with the osteotomy with adequate disclosure of the risks, plaintiff makes no substantive argument as to how what was or was not disclosed to plaintiff would have affected a reasonable person's decision to undergo the procedure. Accordingly, plaintiff has waived any contention in this respect. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (requiring that the argument section of appeals briefs "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the

record relied on"); *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) ("The failure to assert a well-reasoned argument supported by legal authority is a violation of Supreme Court Rule 341(h)(7) [citation], resulting in waiver."); *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986) ("A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.").

¶ 29                                     Calling Expert Live

¶ 30        Plaintiff next argues that the trial court committed reversible error when it conditioned plaintiff's calling Vance live at trial on the reimbursement of defendants' costs and fees associated with taking Vance's evidence deposition in California. According to the parties' representations to the trial court, it is undisputed that trial in this matter was originally transferred to the trial calendar on September 23, 2016, and scheduled for trial on September 29, 2016. On September 26, 2016, just three days before trial, plaintiff's then-counsel took the video evidence deposition of Vance in San Diego, California. Counsel for defendants attended in person. On September 28, 2016, plaintiff filed a *pro se* motion to obtain new counsel and continue trial. Plaintiff's then-counsel also filed a motion to withdraw. Ultimately, plaintiff's then-counsel was allowed to withdraw, trial was continued until January 2017, and plaintiff retained new counsel, who was warned repeatedly by the trial court that he would be stepping into the shoes of prior counsel.

¶ 31        On January 11, 2017, the first day of hearings to address pretrial matters, plaintiff's new counsel indicated that he was "contemplating" whether to call Vance live at trial. Defendants indicated that if plaintiff called Vance live, they would seek their fees and costs associated with taking Vance's evidence deposition in California. The trial court stated that it would not rule on the issue because there was no actual motion pending before it. It did, however, state that defendants' request seemed reasonable. The following day, plaintiff confirmed that there was no pending request to call Vance live. On January 13, 2016, plaintiff represented that she intended to call Vance live at trial. The trial court directed plaintiff to file a written motion so that defendants would have the opportunity to respond and file their fee petition. The trial court also indicated that if it granted plaintiff's motion, it would also order plaintiff to reimburse defendants for their fees and costs in an amount to be determined.

¶ 32        Later that afternoon, plaintiff presented her written motion to call Vance live at trial. In it, she argued that under Illinois Supreme Court Rule 212 (eff. Jan. 1, 2011) she should be permitted to call Vance live without having to reimburse defendants for any of their costs or fees associated with taking Vance's evidence deposition. Defendants argued in response that plaintiff's previous counsel clearly intended to use the evidence deposition at trial in lieu of calling Vance live, as evidenced by the fact that he took the deposition just three days prior to the previously scheduled trial. Plaintiff should not, they argued, be allowed a second chance at Vance's testimony because she had new counsel, and they should not be forced to incur the significant costs of the now-useless evidence deposition. They argued that under Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) the trial court had the discretion to award their costs and fees in such a situation. Plaintiff responded that ordering her to pay prior to trial the nearly $25,000 in costs and fees incurred by defendants in taking Vance's deposition would effectively deprive her of the opportunity to present her case as she saw fit. The trial court

agreed to permit plaintiff to call Vance live if she so wished but indicated that his testimony would be limited to what was previously disclosed in plaintiff's expert disclosures and the testimony given in Vance's discovery and evidence depositions. The trial court also indicated that it would order some reimbursement to defendants for their fees and costs because the trial court believed that it was prejudicial to defendants to have incurred the costs of the depositions shortly before the previously scheduled trial, only to have plaintiff change attorneys, continue trial, and then ultimately decide to forgo the evidence deposition. Accordingly, the trial court directed defendants to file their fee petitions and plaintiff to review the petitions and register any objections she might have to the claimed fees and costs. Based on those objections, the trial court would then determine what amount of fees and costs it would allow. Before moving on to another issue, plaintiff asked for the amount of fees and costs sought by defendants, and defendants responded that the total was $24,981.27. Plaintiff indicated that she did not object to that amount on the basis that it was unreasonable or unnecessary. The trial court indicated again that it was not seeking to impose punitive sanctions or to prevent plaintiff from presenting her case as she saw fit but only to reimburse defendants for their time and expenses and that reimbursement should be made prior to Vance testifying. No written order was entered at this time.

¶ 33 On January 17, 2017, the day before trial began, plaintiff informed the trial court that based on its previous ruling, she would not be calling Vance live at trial.

¶ 34 Plaintiff raised this issue in her motion for new trial. The trial court denied the motion for new trial on October 30, 2017, and made the following specific observations:

"And it may or may not be a good reason, but over strenuous objection, I said I would permit it. I would permit you to call the physician live at trial if you elected to do so. But I also said because a group of defense attorneys had gone to San Diego and conducted this evidence deposition, that I would consider some type of reimbursement.

No one ever came to me—I understand you had conversations with the defendants, whether they told you what their expenses were and what they would be seeking from the court. And you made a decision without asking me what I was going to approve, not to call the witness live at trial. There was never a decision on your part to seek guidance from the court of how much I was going [to] approve.

I don't know if these folks stayed at the Four Seasons or they stayed at the Motel 6, nothing was ever presented to me. I don't know if they were dining at 4 star restaurants or the drive-thru at McDonald's for reimbursement. But I did indicate I thought they were entitled to some type of reasonable reimbursement.

Okay. So that was never presented to me. I never made—I never—to suggest that you were backed into a corner and had no choice I think is disingenuous. I read this motion carefully, and quite frankly I was surprised because no one asked me what I was going to approve.

I think that's an important distinction to say that the court didn't permit you to do it without making payment back. No one ever asked me how much I was going [to] approve in reimbursements."

¶ 35 Following the trial court's denial of plaintiff's motion for new trial, plaintiff filed a motion requesting that the trial court enter a number of *nunc pro tunc* orders memorializing trial

rulings.[1] Included was a proposed order that purported to reflect a ruling by the trial court that plaintiff would be permitted to call Vance live at trial, so long as she first paid defendants $24,981.27 as reimbursement for their fees and costs in attending Vance's evidence deposition. It appears that the trial court refused to sign this order because there is no signed order in the record, although the other proposed orders included with the motion were signed and included in the record on appeal.

¶ 36        On appeal, plaintiff argues that the trial court erred in conditioning her calling of Vance live at trial on the payment of $24,981.27 to defendants. According to plaintiff, this ruling was contrary to the language of Rule 212(b), was not otherwise authorized by law, and deprived her of the opportunity to present her case in the manner she desired. Plaintiff's contention fails for a number of reasons.

¶ 37        First and most importantly, although the trial court did indicate that it would require some level of reimbursement to defendants for the expenses they occurred in traveling to California to attend the evidence deposition of Vance three days prior to the original trial date, there was never any actual ruling imposing a specific amount of reimbursement to be made. The trial court directed plaintiff to review defendants' fee petition and supporting documentation and to file a response. The trial court was clear in stating that it was not ruling on the amount of reimbursement until this occurred. Plaintiff never filed a response to defendants' fee petition and, instead, elected to forgo calling Vance live based solely on the facts that the trial court indicated it would order some reimbursement and the defendants were seeking a total of $24,981.27. At no point was an order ever entered directing plaintiff to reimburse defendants in the amount of $24,981.27. Even during the hearing on the motion for new trial, the trial court emphasized the fact that it had never determined the amount of reimbursement and that plaintiff made the decision not to call Vance without seeking a final determination on that issue. Moreover, it appears that the trial court refused plaintiff's posttrial attempts to obtain a written order calling for the payment of $24,981.27. Although plaintiff cites on appeal portions of the trial record that she purports evidences that the trial court did, in fact, make such a ruling, those portions are cherry-picked from the transcript, do not reflect the entire context of the trial court's statements, and omit all statements by the trial court that it would not rule on the amount of reimbursement. Because the trial court never ordered—either orally or in writing—that plaintiff reimburse defendants $24,981.27 or any other amount, there is nothing for us to review in this regard. Accordingly, because plaintiff was never actually ordered to reimburse defendants anything, there is no basis for us to conclude that the trial court erred in ordering reimbursement.

¶ 38        Moreover, Rule 212(b) does not support plaintiff's position in the manner that she claims. Rule 212(b) provides in relevant part that "[t]he evidence deposition of a physician or surgeon may be introduced in evidence at trial on the motion of either party regardless of the availability of the deponent, without prejudice to the right of either party to subpoena or otherwise call the physician or surgeon for attendance at trial." Plaintiff claims that the trial court's ruling— assuming there was one—violated the language of Rule 212(b) because it prejudiced plaintiff's right to call Vance live. We disagree. Rule 212(b) very clearly provides that the introduction of an evidence deposition into evidence at trial will not affect any of the parties' rights to call

[1]The transcript of the hearing on plaintiff's motion for new trial indicates that plaintiff filed a similar motion in July 2017. That motion is not, however, contained in the record on appeal.

the doctor at trial. Thus, it is the *introduction of the deposition* that cannot prejudice a party's right to call the witness live. In other words, if the deposition is introduced in trial evidence, all of the parties are still free to call the doctor live. Plaintiff is not complaining here that she was prevented from calling Vance live because his evidence deposition had been introduced into evidence. Rather, she complains that conditioning the live testimony of Vance on reimbursing defendants would be prejudicial to her. There is nothing in Rule 212(b) that states the trial court is prohibited from imposing such conditions under the present circumstances. In any case, absent an order actually directing reimbursement in a specific amount, it is impossible for us to assess whether plaintiff was actually prejudiced. Certainly there is an obvious difference in prejudice between an order requiring reimbursement in the amount of $25,000 and an order requiring reimbursement in the amount of $500. Here, again, no order was entered at all, and thus we have no way of assessing whether plaintiff's rights were truly prejudiced.

¶ 39        Finally, even if there were an order for us to review and even if we were to conclude that the trial court erred in conditioning Vance's live testimony on plaintiff's reimbursing defendants, plaintiff has completely failed to explain how she was prejudiced by her inability to call Vance live. Even without Vance's live testimony, plaintiff was not deprived of the opportunity to present Vance's testimony altogether. Rather, his video evidence deposition was played for the jury and entered into evidence. Although plaintiff claims that the trial court's supposed ruling deprived her of the opportunity to present her case as she saw fit, she does not explain what that means in practical terms. She does not make any argument that video deposition did not accurately reflect Vance's testimony or demeanor, the video deposition contained some prejudicial content, different or better evidence could have been presented through live testimony (the trial court specifically limited any live testimony by Vance to what was previously disclosed—a limitation that plaintiff does not contest in any respect), or there was some other advantage to presenting Vance's testimony live that would have affected the outcome of trial. Absent evidence that the use of the evidence deposition over Vance's live testimony prejudiced plaintiff to the extent of affecting the outcome of the trial, any error must be considered harmless. See *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 157 ("[A]n evidentiary error does not automatically mandate reversal, as the error may nevertheless be harmless. [Citation.] Harmless error occurs when, despite the presence of an error, it appears ' "no harm has been done." ' [Citation.] Conversely, reversible error occurs when an error 'appears to have affected the outcome of the trial.' ").

¶ 40                                        Syphilis Evidence

¶ 41        Plaintiff's next contention on appeal is that the trial court erred in allowing defendants to question Dr. Thomas Campbell, plaintiff's primary care physician, about whether syphilis could cause plaintiff's complaints of pain without a definitive diagnosis of syphilis. According to plaintiff, although her medical records indicated that she tested positive for serological markers that could indicate the presence of syphilis, she was never actually diagnosed with syphilis and a subsequent spinal tap actually ruled it out. Without an actual diagnosis of syphilis, plaintiff argues, such evidence is not relevant to assessing potential causes of plaintiff's claimed pain.

¶ 42        As an initial matter, defendants argue that plaintiff forfeited this contention because the trial court granted her motion *in limine* on this topic and because she did not object prior to the

reading of Campbell's deposition. We disagree. Prior to trial, plaintiff filed a motion *in limine* seeking to bar any evidence that she had been diagnosed with or tested for any sexually transmitted disease, including syphilis and HIV, because such evidence was irrelevant and unduly prejudicial. Although the written motion did not contain any contention that such evidence should be barred because plaintiff was never actually diagnosed with syphilis, during arguments on the issue, plaintiff repeatedly argued that the lack of an official diagnosis of syphilis rendered the evidence irrelevant. The trial court granted plaintiff's motion *in limine* to the extent that it directed that any reference to syphilis should be made by referring to it as a "neurological condition" rather than syphilis. It did not, however, agree that the evidence was irrelevant due to the lack of official diagnosis and permitted defendants to question Campbell about whether the "neurological condition" could have contributed to plaintiff's ongoing complaints of pain.

¶ 43        Although the trial court granted plaintiff's motion *in limine* in part by attempting to reduce the prejudice associated with the use of the term syphilis through the substitution of the term "neurological condition," the trial court effectively denied plaintiff's objections to the evidence based on the lack of official diagnosis. Accordingly, we disagree that plaintiff forfeited this issue on the basis that the trial court granted her motion *in limine*. Moreover, we disagree that plaintiff's failure to register another objection to the evidence prior to the reading of Campbell's deposition constituted waiver. Although it is normally the case that a contemporaneous objection must be made even after the ruling on a motion *in limine* (*Guski v. Raja*, 409 Ill. App. 3d 686, 695 (2011)), here Campbell's testimony was presented by the reading of his evidence deposition and the trial court ruled on the parties' specific objections to his testimony prior to trial. During this time, plaintiff clearly registered her objection. Accordingly, we believe that the trial court and defendants were well apprised of plaintiff's objection, and the trial court was given adequate opportunity not only to rule on the objection but to correct any error in its ruling on plaintiff's motion *in limine*. See *People v. McKay*, 282 Ill. App. 3d 108, 111 (1996) ("The underlying purpose of waiver is to preserve finite judicial resources by creating an incentive for litigants to bring to trial courts' attention alleged errors, thereby giving trial courts an opportunity to correct their mistakes.").

¶ 44        Although we conclude that plaintiff did not forfeit this claim of error, we nevertheless conclude that any error in the trial court's ruling is not reversible based on the record before us. Before we get to that, however, we pause to note our concerns about the trial court's ruling decision to admit the syphilis evidence. As mentioned, plaintiff contends that she was never specifically diagnosed with syphilis but instead only tested positive for serological markers indicative of syphilis. Defendants do not make any substantive argument that plaintiff was, in fact, officially diagnosed with syphilis. Instead, they argue that it does not matter whether she was actually diagnosed with syphilis because the purpose of admitting the syphilis evidence was to demonstrate that plaintiff's pain could have been attributed to something other than defendants' negligence. We could not disagree more with defendants' assessment. Although preexisting or other medical conditions can, at times, be relevant to establishing that a plaintiff's pain can be attributed to something other than the defendant's alleged negligence, those conditions are only relevant if the plaintiff actually has those conditions. In other words, plaintiff's pain cannot be attributed to syphilis—as opposed to Stevens's alleged negligence— if plaintiff does not have syphilis. To conclude otherwise would be to say that a defendant could attempt to reduce a plaintiff's damages by a condition the plaintiff never had—a

proposition that is illogical and that we cannot endorse. Accordingly, to the extent that plaintiff never suffered from syphilis, the trial court erred in concluding that the syphilis evidence was relevant to plaintiff's claims of pain.

¶ 45    Although we disagree with the trial court's conclusion that the syphilis evidence was relevant and admissible absent evidence that plaintiff actually had syphilis, as mentioned, we conclude that any error in this respect is not reversible. Defendants argue that the issue of whether syphilis contributed to plaintiff's ongoing complaints of pain relates to the amount of plaintiff's damages, not the issue of defendants' liability, *i.e.*, whether Stevens negligently performed the procedure. Plaintiff does not respond to this contention in any way, and we are inclined to agree with defendants.

¶ 46    "[G]enerally errors concerning the extent of damages are not reversible where the jury finds the defendant was not liable." *Brax v. Kennedy*, 363 Ill. App. 3d 343, 352 (2005). Here, evidence that syphilis could have contributed to plaintiff's ongoing complaints of pain did not have any effect on the determination of whether Stevens negligently performed the procedure. See Ill. R. Evid. 401 (eff. Jan. 1, 2011) (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). In other words, whether or not plaintiff's pain was caused in part by syphilis does not make it more or less likely that Stevens improperly performed the osteotomy or that his negligence also caused plaintiff's injuries. It could, however, have an effect on the determination of what percentage of plaintiff's damages were caused by Stevens's alleged negligence. Accordingly, the issue of whether the trial court erred in allowing defendants to question Campbell about plaintiff's syphilis could only warrant reversal if the jury found defendants liable for negligence. The jury did not so find.

¶ 47    The jury was given several instructions that are relevant to this discussion. First, the jury was instructed that in order to prove defendants liable, plaintiff had the burden of establishing that Stevens was professionally negligent, that plaintiff was injured, and that Stevens's professional negligence was a proximate cause of plaintiff's injuries. The trial court then further instructed the jury that if they found in favor of plaintiff on the issue of liability, *then* they were to assess plaintiff's damages and fix an amount that would fairly compensate her. Finally, the trial court instructed the jury, "If you decide for the Defendants on the question of liability, you will have no occasion to consider the question of damages as to those Defendants." The jury was also presented with two verdict forms. Verdict form A permitted the jury to find in favor of plaintiff and against defendants. It then asked for the jury to identify the total amount of damages suffered by plaintiff as a proximate result of the occurrence at issue and to itemize those damages. Verdict form B, on the other hand, permitted the jury to find in favor of defendants and against plaintiff. It did not contain any questions regarding plaintiff's damages. We must assume that the jury followed these instructions. *People v. Fields*, 135 Ill. 2d 18, 53 (1990); *Auten v. Franklin*, 404 Ill. App. 3d 1130, 1162 (2010).

¶ 48    As discussed above, the jury was instructed that it was to first consider the liability of defendants and then to consider the issues of damages only if it found defendant liable. The jury in this case signed verdict form B, finding in favor of defendants and against plaintiff. By so finding, the jury necessarily found that defendants were not liable for negligence. Had the jury determined that defendants were liable, the jury, as instructed, would then have been required to consider plaintiff's damages. This would have required the jury to utilize verdict

- 13 -

form A. The jury did not employ verdict form A in any respect. Assuming, as we must, that the jury followed the instructions given by the trial court, the jury's finding in favor of defendants without consideration of plaintiff's damages indicates that the jury's verdict was based on a determination that plaintiff failed to carry her burden of proving that defendants were liable.

¶ 49    Accordingly, because the syphilis evidence relates only to the extent of plaintiff's damages and does not impact in any way the jury's determination that defendants were not liable and because we do not otherwise reverse the jury's determination that defendants were not liable, we need not address this contention on appeal. See *Brax*, 363 Ill. App. 3d at 352; see also *Mulvey v. Illinois Bell Telephone Co.*, 53 Ill. 2d 591, 599 (1973) (concluding that it was unnecessary to address issues regarding damages on appeal where the jury found that the defendant was not liable).

¶ 50                            Cross-Examination of Stevens

¶ 51    Finally, plaintiff argues on appeal that the trial court erred in precluding plaintiff from cross-examining Stevens on certain publicly available literature related to the procedure performed on plaintiff. After defendants completed their direct examinations of Stevens but before plaintiff commenced her cross-examination, plaintiff presented defendants with a number of publications that she intended to use to cross-examine Stevens, including a surgical reference guide for malunions of the distal femur published by the AO Foundation and two technique guides—one for angled blade plates for adults and one for the 95-degree condylar plate. Defendants objected to the use of these documents on the bases that they were not disclosed prior to trial and the technique guides were published after Stevens performed the procedure on plaintiff. The trial court agreed on both counts and barred plaintiff from using them during her cross-examination of Stevens.

¶ 52    As an initial matter, we observe that although plaintiff complains about the trial court's bar on the use of the AO Foundation's surgical reference guide, she offers no explanation for why the trial court's exclusion of this document was error. Rather, her arguments focus primarily on the exclusion of the technique guides. Accordingly, we conclude that plaintiff has forfeited any contention of error with respect to the surgical reference guide and will focus entirely on the technique guides. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (requiring that the argument section of appeals briefs "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *Sakellariadis*, 391 Ill. App. 3d at 804 ("The failure to assert a well-reasoned argument supported by legal authority is a violation of Supreme Court Rule 341(h)(7) [citation], resulting in waiver.").

¶ 53    On appeal, plaintiff argues that she was not required to disclose the technique guides during discovery because defendants did not specifically request them and because she was only going to use them on cross-examination. She also argues that although the technique guides are dated after plaintiff's procedure, they are substantially the same as pre-occurrence literature and she should have been allowed to use these documents for impeachment purposes. We need not address whether plaintiff had an obligation to disclose the technique guides prior to trial because we conclude that technique guides were not relevant, both because they were post-occurrence literature and because they were not impeaching in any respect argued by plaintiff.

¶ 54    Plaintiff does not dispute that the general rule is that standards that were not in effect at the time of her treatment are irrelevant to establishing the standard of care governing her treatment. See *Nelson v. Upadhyaya*, 361 Ill. App. 3d 415, 422 (2005); *Smith v. South Shore Hospital*, 187 Ill. App. 3d 847, 856 (1989). Rather, she argues that, to her knowledge, the standards expressed in the technique guides she sought to use, which were published in 2009 and 2016, did not "materially differ" from earlier versions of the guides. Plaintiff did not raise this contention in the trial court, however, nor does she cite anything in the record that supports her contention that the pre- and post-occurrence technique guides were substantially the same. Accordingly, plaintiff has waived this contention. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (requiring that the argument section of appeals briefs "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) ("It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal.").

¶ 55    Plaintiff also argues that the general rule barring the use of post-occurrence literature is inapplicable here because she did not intend to use the technique guides to establish a deviation from the standard of care but instead intended to use them to impeach some of Stevens's testimony. First, plaintiff claims that she wanted to use the technique guides to impeach Stevens's deposition testimony that his oblique installation of the condylar plate during plaintiff's surgery was consistent with the technique guides. There are multiple problems with this contention. Plaintiff claims that Stevens offered this testimony during his discovery deposition. His discovery deposition testimony, however, was not presented to the jury at trial, and plaintiff does not cite any of Stevens's trial testimony where he testified that the technique guides called for oblique installation of the condylar blade.

¶ 56    In addition, the pages of discovery deposition to which plaintiff cites for the claimed testimony do not support her claim that Stevens offered such testimony. In one of the cited sections, Stevens was asked if one of the technique guides (the date of which is not specified) said anything about whether the blade should be installed obliquely or parallel. Stevens responded that he did not know what the guide said. In the other cited section, Stevens was asked if he knew whether one of the technique guides addressed the angle at which the condylar plate should be installed. Stevens responded that he was sure that it did. He was then asked if it was his recollection that it was appropriate to install it obliquely at times, to which he responded that, in plaintiff's case, it was appropriate that the plate be installed obliquely. He was never asked whether the technique guide called for parallel or oblique installation. These cited portions of Stevens's discovery deposition do not indicate that Stevens testified that the technique guides called for the oblique installation of the plate. Thus, it would not be impeaching to question Stevens about the fact that the technique guides called for parallel installation of the plate. Moreover, even if Stevens did testify as plaintiff claims, cross-examining Stevens about what the 2009 and 2016 technique guides said would only be impeaching if Stevens's testimony was offered specifically with respect to the 2009 and 2016 technique guides. In his discovery deposition, however, Stevens was only questioned about one of the technique guides, and there is no indication what version of that technique guide was.

¶ 57    Next, plaintiff contends that the technique guides' statement that the condylar plate should be installed in a parallel position was impeaching to Stevens's trial testimony that a

preponderance of medical literature supported his oblique installation of the plate in plaintiff. What Stevens actually testified to was that Vance's criticism of Stevens's oblique installation of the condylar plate "[was] not the preponderance of evidence of the medical literature regarding distal femoral valgus osteotomies. Or varus osteotomies." The fact that two post-occurrence technique guides—which were not specific to distal femoral valgus or varus osteotomies—might have called for the parallel installation of the condylar plate does not contradict Stevens's testimony that the preponderance of the literature on distal femoral valgus and varus osteotomies called for oblique installation at the time of the procedure.

¶ 58     We note that plaintiff also claims on appeal that the technique guides would have impeached Stevens's testimony that there was no basis for the parallel installation of the condylar plate and that the parallel installation of the condylar plate would never be justified. Plaintiff does not, however, include any record citations to this testimony and therefore has forfeited any contention in this respect. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (requiring that the argument section of appeals briefs "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *Sakellariadis*, 391 Ill. App. 3d at 804 ("The failure to assert a well-reasoned argument supported by legal authority is a violation of Supreme Court Rule 341(h)(7) [citation], resulting in waiver.").

¶ 59     In sum, the technique guides were not relevant to establishing the applicable standard of care governing the procedure Stevens performed on plaintiff or any deviation from that standard of care, because they were published after plaintiff's procedure was performed. See *Nelson*, 361 Ill. App. 3d at 422; *Smith*, 187 Ill. App. 3d at 856. Moreover, even if plaintiff's sole purpose of using the technique guides was to impeach Stevens and not establish a deviation from the standard of care, the use of the technique guides were not impeaching in the manner claimed by plaintiff. Accordingly, the trial court did not err in excluding the use of the technique guides. See *Regas v. Linton*, 72 Ill. App. 3d 7, 13 (1979) (where evidence sought to be introduced was not inconsistent with the witness's testimony, the trial court did not err in excluding such evidence as not impeaching); see also *Ogg v. City of Springfield*, 121 Ill. App. 3d 25, 39 (1984) ("The test for determining whether a prior statement is sufficiently inconsistent to be used for impeachment purposes is whether the inconsistency is great enough to contravene the witness' direct testimony on a material matter.").

¶ 60     Before concluding, we pause to observe that most of our conclusions are based, either explicitly or implicitly, on the strategic decisions made by plaintiff's counsel in the trial court. We also observe that plaintiff's counsel at trial—who was retained very shortly before trial after plaintiff suddenly terminated her previous counsel the day before the originally scheduled trial—was significantly constrained by the strategic decisions made by plaintiff's prior counsels. More specifically, plaintiff's trial counsel was constrained by Vance's expert testimony disclosed by prior counsel, prior counsel's decision to take the evidence deposition of Vance, and the trial evidence disclosed by prior counsel. Thus, although the outcomes of most of the issues in this appeal were dictated by the strategic decisions made by plaintiff's prior counsel in the trial court, plaintiff's trial counsel was forced to follow through with those decisions as a result of plaintiff's sudden dismissal of her prior counsel the day before trial (after having gone through several other attorneys prior to that) and plaintiff's retention of trial counsel at the last minute.

¶ 61                                    CONCLUSION

¶ 62          For the forgoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 63          Affirmed.