2021 IL App (1st) 201038-U

SECOND DIVISION
July 20, 2021

No. 1-20-1038

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| LORI A. HUBERS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 16 L 10358 |
| | ) | |
| J. MICHAEL MILLIS, M.D., and THE | ) | |
| UNIVERSITY OF CHICAGO MEDICAL | ) | |
| CENTER, an Illinois Not-For-Profit Corporation, | ) | The Honorable |
| | ) | Rena Van Tine, |
| Defendants-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

*HELD*: Trial court's grant of summary judgment in favor of defendants was proper where plaintiff failed to establish elements of her cause of action for medical malpractice based on lack of informed consent with required medical expert testimony.

¶ 1        Plaintiff-appellant Lori A. Hubers (plaintiff) brought suit against defendants-appellees J.

Michael Millis, M.D., and The University of Chicago Medical Center, an Illinois not-for-

profit corporation (defendants or as named) following the removal of a hemangioma via an enucleation procedure. Plaintiff alleged medical malpractice due to defendants' failure to obtain her informed consent prior to performing the surgery in that they failed to adequately disclose both the size and location of the incision required to perform the surgery and the risk of developing an incisional hernia. After discovery was conducted, defendants moved for summary judgment, which the trial court granted based on plaintiff's lack of sufficient evidence to establish the elements of her claim. Plaintiff now appeals, contending that the trial court erred in disregarding and/or weighing the expert opinion testimony she presented and that said testimony undoubtedly created genuine issues of material fact, rendering summary judgment improper. She asks that we reverse the trial court's decision and remand with directions to set the cause for a jury trial. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3        Deposition testimony in this cause was voluminous. We present only those record facts that are relevant to the matters at issue herein.

¶ 4                    *Initial Consultations and Unrelated Colon Surgery*

¶ 5         Dr. Talia Baker testified that in March 2012, plaintiff sought treatment from her with respect to a hemangioma, or mass, she had on her liver. Following testing, Dr. Baker reported to plaintiff that the hemangioma was asymptomatic and she was exhibiting normal liver function at that time, so plaintiff chose to wait regarding any treatment. In May 2012, plaintiff returned to Dr. Baker expressing she wanted to proceed with the removal of the hemangioma, to coincide with a planned procedure to be performed by another doctor, Dr. Kyle Mueller, on her colon for a separate and unrelated diagnosis of diverticulosis. Dr. Baker had participated in such combination surgeries before. With respect to her liver mass,

2

she discussed with plaintiff that she could perform the removal of the hemangioma laparoscopically, making multiple "key hole" incisions approximately four to six centimeters long. She further explained to plaintiff that removal of a hemangioma laparoscopically required removal of a portion of her liver, as well. Dr. Baker also discussed with plaintiff the potential that, during the planned laparoscopic procedure, she may have to convert to an open procedure (which would require a traditional incision to excise the mass) should the need arise. Ultimately, plaintiff did not return to see her following this May 2012 consultation, and Dr. Baker did not perform any procedure on plaintiff.

¶ 6 Plaintiff did, however, proceed with the planned colon surgery in July 2012 for her diverticular disease. With respect to this surgery, Dr. Mueller testified the he discussed with plaintiff the risks of her procedure, including the potential of an incisional hernia. He also informed plaintiff that while he intended to perform the surgery laparoscopically, he might have to covert to an open procedure depending on what he encountered during the surgery. Dr. Mueller recalled that plaintiff was concerned about the anticipated size of the incision required, and that she was "very, very nervous about not wanting a big incision." Dr. Mueller further recalled that, following the procedure, plaintiff reported to him that she was unhappy with a portion of the resulting scar because it was somewhat raised, and he informed her that she could see someone about it and also discussed topicals she could use to help fade it. Dr. Mueller noted that plaintiff saw a plastic surgeon in October 2012 because of the scar from this colon procedure. At the close of her treatment with him in the fall of 2012, Dr. Mueller instructed plaintiff to follow up with Dr. Baker regarding her hemangioma.

¶ 7 *Enucleation Surgery at Issue*

¶ 8        Approximately two years later, and upon experiencing pain and pressure in her abdomen associated with the hemangioma, plaintiff visited defendant Dr. Millis, a liver surgeon, on September 2, 2014, for a consultation.  Also present at the meeting was plaintiff's sister and defendant's nurse.  Dr. Millis testified that, when plaintiff came to see him, the hemangioma was now "a grape-fruit-sized mass" and was life-threatening.  He further noted a significant threat of potential internal bleeding if it burst.  Accordingly, although Dr. Baker had years before offered plaintiff a laparoscopic procedure, Dr. Millis told plaintiff that he would remove the mass using an open enucleation procedure, as this was now the safer approach.  Dr. Millis testified that he, in fact, did not even discuss with plaintiff the potential for him to perform a laparoscopic surgery, and specified to her that he only does open procedures in situations such as hers where the mass is very large. He offered to plaintiff that if she wanted laparoscopic surgery to remove the hemangioma, she would have to go elsewhere.

¶ 9        Dr. Millis further testified that, at this initial meeting which lasted some 45 minutes according to his medical notes, he also discussed with plaintiff the planned location of the surgical incision required and demonstrated for her that it would be from the bottom of the breastbone to underneath the right side of the ribcage, tracing it on her abdomen.  He did not specify any particular size of the incision and told plaintiff only that it would be no bigger than necessary to safely perform the operation.  Dr. Millis stated that the precise size of the anticipated incision was not considered a material risk with respect to an enucleation, especially in plaintiff's instance where the hemangioma was life-threatening and the need for its removal was emergent and, for this reason, he did not discuss with her an exact size. Apart from the incision, Dr. Millis informed plaintiff of the risks and benefits of the enucleation surgery, which most critically were the nature of her current condition, the fact

4

that the enucleation would require an open operation, and that there was a risk of bleeding. He explained to plaintiff that this procedure would remove the hemangioma without also removing part of the liver, whereas the opposite was true for a laparoscopy. He also informed her regarding the postoperative implications and restrictions, including, and particularly, the need to care for the surgical wound and not exert undue pressure on it. He specified to plaintiff that she should not lift anything over the weight of a gallon of milk for approximately six to eight weeks postsurgery, and that she should gradually increase her amount of activity only after that period of time, as she would not feel the same as her normal self strength-wise for about three months.

¶ 10   Following this consultation, plaintiff agreed to have the enucleation procedure to remove the hemangioma, to be performed by Dr. Millis at defendant hospital on October 22, 2014. Defendant hospital is a teaching hospital, and Dr. Millis was in charge of different surgical residents who assisted him. That morning, plaintiff arrived and was prepped for surgery. One of Dr. Millis' surgical residents, Dr. Omar Hussain, presented plaintiff with a prepared written consent form which mistakenly identified her procedure as a right hepatectomy.[1] Nonetheless, plaintiff signed the form and Dr. Millis performed the planned enucleation via open surgery, as discussed, and removed plaintiff's hemangioma without removing any portion of her liver. The incision Dr. Millis used was, as he had discussed with plaintiff, near the bottom of her breastbone to the bottom of her right ribcage. Dr. Millis testified that the incision was the size and at the location expected, and that the surgery was successful. Plaintiff remained in the hospital until her discharge on October 26, 2014. Dr. Millis

---

[1] For the record, a hepatectomy is the removal of a considerable portion of the liver, whereas an enucleation is the removal of something from the liver, such as a growth, cyst, mass or abnormality, without removing any of the liver itself.

verified, and his patient notes showed, that he visited plaintiff in the hospital every day of her stay following surgery. Plaintiff did not complain about the length of the incision at any time, and there was no discussion of it between them. Upon her discharge, and again as verified by his patient notes, Dr. Millis repeated the postoperative instructions to plaintiff to limit her activity, not lift any weight over that of a gallon of milk, and to only gradually increase her activity after at least the six-to-eight-week period postsurgery.

¶ 11    Dr. Millis concluded his testimony by recounting that he next saw plaintiff at her two-week postoperative appointment, as scheduled, on November 4, 2014. He noted that her incision was healing well at that time, and again, plaintiff made no mention to him about any dissatisfaction with the length or location of it. Plaintiff was to return for follow-up in future weeks, but she did not, and this was the last time Dr. Millis saw plaintiff.

¶ 12    Jeanine Elkin, Dr. Millis' nurse, corroborated much of his testimony. She confirmed that at the September 2, 2014 initial consultation, plaintiff arrived with her sister and two of them, along with Dr. Millis and herself, had a 45-minute meeting regarding plaintiff's hemangioma. Nurse Elkin testified that Dr. Millis described the location, dimension, configuration and shape of the planned incision and he did so by pointing to plaintiff's abdomen and showing her where it would be, namely, from her xiphoid process wrapped around to the bottom of her right rib cage. Nurse Elkin stated that Dr. Millis did not specify a quantifiable length for the incision and never told plaintiff that it would be three to four inches. Nurse Elkin recalled that during the consultation, plaintiff asked Dr. Millis if he could make the incision at her bikini line; Dr. Millis told her this could not be done and that it would be impossible for this type of surgery. Plaintiff then asked Dr. Millis if a plastic surgeon could be present during the surgery to either perform the incision at the start or close

her at the end; Dr. Millis again told her no, and informed her that he uses a plastic surgery close when he performs enucleations. Dr. Millis concluded the consultation by informing plaintiff with respect to postoperative instructions, specifying that she should not lift anything greater than ten pounds and not do anything physically that would increase the pressure on her abdomen, such as sit-ups or rowing exercises, for about 8 to 10 weeks.

¶ 13    Nurse Elkin testified that after Dr. Millis left the meeting, she continued to speak with plaintiff and her sister for another 45 minutes to answer any questions and to discuss presurgical preparations and what would happen during the surgery, as well as postoperatively. She stated that she reiterated to plaintiff Dr. Millis instructions regarding limits on activities and lifting. She informed her about the potential of incisional hernias several times, and explained to plaintiff that lifting or undue pressure on the abdomen increased the risk for these. She also told plaintiff that, as she was more conservative than Dr. Millis, she would extend the time frame of her recovery and abstention from her regular activities such as lifting or exercising to approximately 12 weeks postsurgery. Nurse Elkin recalled that plaintiff was scared about the length of the incision.

¶ 14    Nurse Elkin further testified that following surgery, she spoke with plaintiff six times after she went home from her hospital stay to check on her and plaintiff said nothing, at any of these times or ever, with respect to the incision or scar. Nurse Elkin's patient notes documented these communications. She stated that two weeks after surgery, plaintiff called her and told her she was experiencing pain on her side. When nurse Elkin asked about her activities, plaintiff described that she had been exercising and walking three to four miles a day on her treadmill on an incline. Nurse Elkin told plaintiff to stop walking at an incline, as this was putting undue pressure on her abdomen. Nurse Elkin testified that while she and Dr.

Millis warned about undue pressure on the abdomen and the potential for incisional hernias resulting therefrom, they did not specify that inclined walking could produce such pressure and plaintiff did not ask them; had she asked, nurse Elkin would have told plaintiff not to do this activity. Nurse Elkin concluded her testimony by noting that her last follow-up communication with plaintiff was in December 2014, when she contacted her to see if she was still uncomfortable and to tell her that, if she was, she should call the office or make an appointment. She did not hear from plaintiff again.

¶ 15                                *Subsequent Procedures*

¶ 16        Dr. Mueller testified that, following her colon surgery in 2012, he next saw plaintiff again on April 21, 2015, six months after her enucleation procedure with defendant Dr. Millis. She presented with an incisional hernia near Dr. Millis' surgical site. Dr. Mueller performed a surgery to repair plaintiff's hernia in May 2015, using wire mesh. Dr. Mueller combined his hernia repair procedure with plastic surgery and liposuction performed on plaintiff by another doctor.

¶ 17                                    *Litigation*

¶ 18        In 2016, plaintiff filed a complaint at law sounding in medical malpractice against defendants. Therein, she alleged they did not obtain her informed consent to the enucleation because Dr. Millis "failed to disclose to [her] material medical information," in that he misled her about the length of the incision which he told her would be approximately 3 inches near her lower waist but was actually 14 inches extending across her mid-section, and in that he did not explain that the open enucleation procedure increased the risk of developing a postoperative incisional hernia "as well as an unsightly, permanent scar." She

claimed that, had Dr. Millis "not misled" her in these ways, she would not have chosen this surgery but, instead, the laparoscopic option of removal offered by Dr. Baker.

¶ 19    During her deposition, plaintiff testified that she has had many surgeries throughout her life on several different parts of her body. She admitted, and reaffirmed in her brief on appeal, that she is generally aware from her own medical history regarding the risk that laparoscopic procedures can sometimes necessitate conversion to open procedures requiring incisions, and the risk that incisional hernias can develop in the abdomen following either type of surgery.

¶ 20    Plaintiff recounted that she went with her sister to see defendant Dr. Millis on September 2, 2014 for a consultation regarding the removal of her hemangioma. She understood that the procedure offered by defendant was an open one and would not be laparoscopic. She discussed the potential scar with him, as she had a little scar from her laparoscopic colon resection and wanted, with this procedure as well, "a scar that's not upsetting" to her. According to plaintiff, defendant responded that the incision he would make would be near her bikini line and told her, while demonstrating with his thumb and forefinger, that it would be about three inches in length. Plaintiff averred that she then asked defendant if she should have a plastic surgeon present during the procedure and that defendant told her she would not need one for an incision this small. Plaintiff also stated that defendant told her the recovery time for the surgery would be between six and eight weeks, whereupon she could resume full activity, and that he did not mention anything regarding a risk of incisional hernias. Plaintiff noted that she liked defendant's surgical plan and recovery time, which seemed less invasive and much shorter than Dr. Baker's estimates, so she scheduled the surgery with defendants.

¶ 21     Plaintiff next described that she had the surgery and, contrary to his testimony and patient notes, saw Dr. Millis only one time for a few minutes during her four-day hospital stay. She verified that upon her discharge, she received instructions about her postoperative care from both defendant and nurse Elkin, including that she could take only short walks and was not to lift anything heavier than a gallon of milk. Once she was home, she received multiple calls from Elkin checking on her pain and comfort levels, and plaintiff did not have any complaints. She next saw defendant at her scheduled two-week postoperative appointment on November 4, 2014, where plaintiff said nothing about the scar, its size, or its location. Plaintiff stated that at this appointment, defendant told her she could resume exercising six to eight weeks post-surgery, including lifting without limit and performing core exercises. Plaintiff noted that she did so after eight weeks, resuming attendance at her gym and performing mild cardio, weightlifting, and secondary core activities (*i.e.*, core tightening, etc.). After a week of doing so, plaintiff developed a hernia near her incision site. However, she did not contact defendant and never spoke to him again after the first postoperative appointment. Instead, stating that she was "hoping it would go away," she waited four to five months, and then went to see Dr. Mueller in April 2015. Plaintiff again verified during her deposition that she never confronted defendant nor discussed with him any issue regarding her hernia, the size of the incision, or the resulting scar.

¶ 22     Cheryl Sheehan, plaintiff's sister, testified in her deposition that she went with plaintiff to her initial consultation with defendant which, contrary to his deposition and patient notes, lasted only a half hour. Nurse Elkin was also present. Sheehan stated that during this meeting, defendant told plaintiff that the incision he would be making to remove her hemangioma would be only four inches long and that her recovery time would be much less

than what Dr. Baker had proposed. She described, as plaintiff did, that defendant used his thumb and first finger to demonstrate how big the incision would be, and that it amounted to no more than four inches and would be along the angle of plaintiff's ribcage. With respect to the potential of a bikini-line incision, Sheehan stated that it was plaintiff who requested it, and that defendant never suggested it was an option; she recalled that defendant made clear the location of the incision would be below her sternum on the right side of her abdomen and would not be able to be hidden in her bikini line. Sheehan averred that defendant also made clear the procedure would be an open surgery and he would not do it laparoscopically. She testified that defendant discussed with plaintiff the risks of the procedure, including anesthesia and infection, and that she would not be able to lift anything for a period of time due to the incision, but Sheehan could not recall the length of time plaintiff would be so restricted. Sheehan verified that, after defendant left, the consultation continued with nurse Elkin for approximately 10 more minutes, but she could not remember what was discussed. Sheehan described that, in her discussions with plaintiff about whether she would have the enucleation, they agreed she should particularly because, in contrast to a laparoscopic procedure, there would be no removal of a portion of her liver and her recovery time, including when she could return to drinking alcohol, would be less.

¶ 23    Sheehan further testified that she accompanied plaintiff on the day of surgery. She stated that even though she was with plaintiff in the hospital, she never saw defendant that day or at any time ever following the initial consultation at his office, and she never saw Elkin after the surgery. Sheehan averred that she first saw plaintiff's incision immediately following the surgery and was "shocked" at the size and shape of it. She was also present sometime later when plaintiff first saw her incision, whereupon plaintiff became very upset at its size.

11

¶ 24                                    *Expert Testimony*

¶ 25        In her effort to present expert medical testimony in support of her claim against

defendants, plaintiff secured additional depositional and documentary evidence from Dr.

Mueller.  She submitted a two-page report prepared by him pursuant to section 2-622(a) of

the Illinois Code of Civil Procedure (see 735 ILCA 5/2-622(a) (West 2018)) (Report),

explaining his medical conclusions regarding her cause of action against defendants.  The

Report acknowledges that Dr. Mueller's conclusions are based on his discussions with

plaintiff, his review of her medical records, and his experience, training, and education; Dr.

Mueller had not reviewed the depositions of defendant Dr. Millis nor of nurse Elkin.  In the

Report, Dr. Mueller states that a "physician who performs procedures or surgeries has an

obligation to fully inform a patient of the attendant risks and alternative treatments, if any, of

that procedure."  He then states that "per [his (Dr. Mueller's own)] discussion with

[plaintiff]," defendant represented to her that the surgery he performed could be done using a

three-inch incision and did not inform her that a larger incision could be required nor that the

surgery could lead to the development of an incisional hernia.  He further comments that,

again per his conversations with plaintiff, she elected to proceed with the surgery "[u]naware

of the risk of developing an incisional hernia and believing the incision would be no more

than three inches."  After recounting his reparation of the hernia and plaintiff's additional

plastic surgery, Dr. Mueller concludes his Report by stating that, in his "expert medical

opinion, [plaintiff] has a meritorious cause of action against defendant for failing to provide

her a full disclosure of the risks of the surgery."  The Report does not provide any

information with respect to the applicable standard of care nor any opinion on whether

defendant's treatment of plaintiff deviated from this.

12

¶ 26        Plaintiff later moved to file a supplemental answer to her Illinois Supreme Court Rule (Rule) 213(f)(3) interrogatories.  In this supplemental answer, plaintiff again identified Dr. Mueller as her expert witness and "reiterate[d] her intention to call [him] to express the opinions recited in his [R]eport."  She specified that Dr. Mueller "will opine that [defendant Dr. Millis'] 'fail(ure) to provide her a full disclosure …' recited in the last paragraph of that [R]eport constituted a deviation by [defendant] of the standard of care described" in the Report.  And, plaintiff insisted that Dr. Mueller "will opine that the incisional hernia that he treated was a risk of the procedure performed by [defendant] that should have been disclosed to plaintiff and that failing to disclose this risk was [also] a deviation from the standard of care" described in his Report, and "that the open procedure performed by [defendant] *** was a medical cause of the incisional hernias" plaintiff developed thereafter.

¶ 27        In his initial deposition,[2] Dr. Mueller acknowledged that he has never performed the particular type of hemangioma surgery defendant did in this cause, that he is not a liver expert, and that he has never reviewed cases of hemangioma surgeries or enucleations; he is a general surgeon and that is all he holds himself out to be.  He averred that the risks discussed between doctors and patients in preparation for surgery are not limited to what is in a doctor's written notes or reports but, rather, doctors discuss various aspects of surgery that are not always documented following consultation with a patient.  Dr. Mueller noted that this would include the risk of incisional hernias subsequent to an open procedure like an enucleation, and that such hernias are low "down the list of significant problems" following

---

[2] The depositional testimony of Dr. Mueller we refer to here was given by him during the same deposition to which we referred earlier in our decision, discussing his interactions with plaintiff as her treating physician.  Now, as we detail those facts pertaining to the litigation involving the hemangioma surgery and expert testimony, we return to Dr. Mueller's deposition to present his comments regarding that portion of this cause, as plaintiff's medical expert.  For the record, we note that Dr. Mueller was deposed a second time during this litigation.  We will discuss his second deposition and its contents separately, below.

surgeries, particularly those where life-threatening conditions are attempting to be remedied. More important risks to be discussed in such instances would be, according to Dr. Mueller, bleeding, recouperation, and irreversible damage and, simply because a certain risk was not documented in patient notes does not mean it was not discussed between the doctor and the patient. Dr. Mueller stated that the standard of care requires discussion of surgical risks, but not necessarily the documentation that a discussion was had regarding every such risk. He admitted that he had no personal knowledge of any meeting plaintiff had with Dr. Millis or what was discussed between them; he had not reviewed defendant's deposition and was relying solely on his discussions with plaintiff in preparation for this cause.

¶ 28 Regarding incisional hernias, specifically, Dr. Mueller testified that they are inherent risks in any abdominal surgery, and their occurrence after surgery does not decisively indicate that a patient received poor care or treatment. He stated that he expects a patient to follow postoperative instructions and that, if she does not and subsequently if she develops an incisional hernia, the responsibility lies with her. He admitted that he had no personal knowledge with respect to whether plaintiff followed her postoperative instructions, nor could he say that her hernia somehow suggests defendant did not follow the standard of care here. Further, regarding the size of an incision, Dr. Mueller opined that if plaintiff was not told about its anticipated size, this would be below the accepted standard of care; however, again, he admitted he had no personal knowledge of what defendant told plaintiff about this. He further refused to opine as to whether, in this particular case, the size of plaintiff's incision increased the risk for her to develop an incisional hernia; he stated that he did not know either way if this was true. Additionally, Dr. Mueller commented that, with respect to consent forms, it is within the standard of care to have a consent document that does not set

14

forth every specific risk involved in a surgical procedure. Ultimately, he stated that if defendant advised plaintiff of the risk of an incisional hernia and the relative size of the anticipated incision, he would not be critical of him or the care defendants provided her. He further admitted that there was nothing in his Report that should be interpreted as critical of the surgical technique used by Dr. Millis (enucleation as opposed to laparoscopy), as such an opinion would be beyond his area of expertise. Dr. Mueller concluded his initial deposition by stating that he did not hold any opinions in this cause beyond those stated in his Report and that he had no part in the preparation of plaintiff's supplemental answer to her Rule 213(f)(3) interrogatories.

¶ 29    Following Dr. Mueller's initial deposition, plaintiff sought leave to file an addendum to her supplemental answer to her Rule 213(f)(3) interrogatories, which the trial court allowed. In this addendum, plaintiff asserted that, after now having reviewed other depositions in this cause, including those of plaintiff, Sheehan, defendant, Dr. Baker, and nurse Elkin, Dr. Mueller would opine that "if the information [regarding the length and location of the anticipated surgical incision] was conveyed by defendant Millis in the manner described by plaintiff and Sheehan, then defendants deviated from the applicable standard of care respecting informed consent described in the earlier disclosures of Dr. Mueller's opinions." She further insisted that Dr. Mueller would also opine that the consent form in this cause, which identified a procedure other than the one performed, was inaccurate "and an additional deviation by defendants from the applicable standard of care respecting informed consent."

¶ 30    Pursuant to this addendum, Dr. Mueller was deposed a second time. He averred that he had now reviewed the other depositions given in this cause. However, he reaffirmed that these "did not change, alter, or supplement" the expert opinions he previously disclosed in

15

any way regarding the size and location of plaintiff's scar or the development of her incisional hernia.

¶ 31    Dr. Mueller stated that "[t]he only thing that was notable to" him now that he had not opined on before in his initial deposition or Report was that the consent form plaintiff signed the day of surgery, as prepared by surgical assistant Dr. Hussain, listed a different procedure, namely, a hepatectomy rather than an enucleation. However, Dr. Mueller testified that documents like paper consent forms filled out on the day of a surgery do not comprise informed consent. Rather, he described that informed consent is a process that takes place over a period of time as a surgeon and patient consult and discuss surgical options and reach a "mutual decision to proceed with the surgery as planned." He described that informed consent is obtained before any piece of paper is signed on the day of surgery, and usually over multiple interactions between doctor and patient; although the "signed paper form should match up with what the informed consent started out as," any discrepancy in the paper form would not indicate that informed consent was not obtained by the doctor from the patient. He further described that informed consent is "a continuum" that begins in a doctor's office "the minute you start even talking about a surgery" and "continues on through as you have further discussions."

¶ 32    Specifically with respect to what occurred here, Dr. Mueller stated that, upon his review of the depositions, plaintiff went through a consent process that went beyond signing the paper form on the day of surgery. He noted that the depositions showed she was told explicitly about what an enucleation was, that this was the planned surgery defendant would perform on her to remove the hemangioma, and that this was the surgery defendant in fact performed. He further acknowledged that the depositions showed plaintiff was told about the

16

various risks, benefits, and alternatives to the enucleation, that she knew all of this, and that she knew she would be having an enucleation. Dr. Mueller stated that there was no evidence to suggest plaintiff thought she would be having a different procedure, and it was his opinion that the discrepancy in the paper consent form was simply "an error" that occurred on the day of surgery by a resident who was trying to assist Dr. Millis during a busy time. Finally, Dr. Mueller commented that the paper consent "form is not designed for writing every little detail down" with respect to the procedure or consent obtained, and that this information is more often contained in a doctor's operative report. Dr. Mueller conceded that defendant's operative report from plaintiff's surgery discussed the enucleation procedure and documented that he had spoken to plaintiff about that, its risks, and her condition, and that plaintiff provided informed consent agreeing to the procedure. Dr. Mueller further conceded that the written consent form could be "throw[n] out" because, regardless of how the mistake on it was made, the form was irrelevant here since Dr. Millis' operative report verified that he had an informed consent discussion with plaintiff and plaintiff consented to the procedure.

¶ 33      Following the depositional testimony, defendants moved for summary judgment, and the trial court granted their motion, finding that while there were some disputed facts, there was "no genuine issue of material disputed facts." The court began its colloquy by noting that, in a medical malpractice case, expert testimony is necessary. The court reviewed Dr. Mueller's expert testimony and declared that, even if it "could stretch" it "into a specific opinion that the defendant deviated from the standard of care, which is impossible [since he] never comes out and actually says that, there is no causal link established through the medical testimony that any purported negligence by the defendant doctor caused the injury."

¶ 34    In support of this finding, the court first noted that Dr. Mueller never opined that defendant's conduct deviated and fell below the accepted standard of care or that he breached this standard in any way. He simply stated that if plaintiff were to be believed, then defendant deviated from the standard, but if defendant were to be believed, then he did not. The court discussed that plaintiff's Rule 213(f)(3) answers, as prepared by her attorneys, went "well beyond what [Dr. Mueller] actually testified to at his deposition," and that these were "very different." It concluded that Dr. Muller simply did not opine with any specificity as to the standard of care.

¶ 35    Next, the court discussed that plaintiff did not demonstrate proximate cause, as she did not provide any specific expert medial opinion testimony that showed that defendant's negligence (if there was any) was a proximate cause of her injury. The court noted that Dr. Mueller could not state that, even if plaintiff underwent a laparoscopic procedure as she says she would have had she been sufficiently informed, she would not have experienced an incisional hernia. Instead, the court recalled his testimony that no one could say what caused the hernia, that incisional hernias can develop despite reasonable and proper care, and that he had no opinion regarding the incision size with respect to an enucleation procedure and hernias.

¶ 36    Finally, with respect to consent, the court concluded that, while Dr. Mueller's second deposition focused on this, it "added nothing material to the case and the issues raised." The court noted that Dr. Mueller specifically "testified that this technical mistake [in the consent form] did not matter in this case, because the defendant doctor verified in his operative report that he had the informed consent discussion with the plaintiff" and, consequently, that "the

wrong consent form affected nothing in terms of the outcome of the case" and was "irrelevant."

¶ 37 Based on all this, the trial court granted summary judgment in defendants' favor.

¶ 38 ANALYSIS

¶ 39 On appeal, plaintiff contends that the trial court erred in granting summary judgment. Focusing exclusively on the elements of an informed consent claim, she insists that the court "simply ignored or improperly weighed Dr. Mueller's opinion testimony," which was otherwise "sufficient to establish" both the standard of care applicable to defendants and defendants' breach of that standard of care when it came to disclosing the risk of incisional hernias and the size and location of the incision Dr. Millis made. She further claims that Dr. Mueller's opinions, even those based solely on her and Sheehan's version of what information was communicated to her by defendants, along with her testimony regarding her reliance on that information, raise disputed questions of fact on the issue of proximate cause that should be presented to a jury. Based on our review of the record, we wholly disagree.

¶ 40 We begin with these general legal principles. Summary judgment is proper when the pleadings, affidavits, depositions and admissions of record, construed strictly against the moving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See *Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001); accord *Purtill v. Hess*, 111 Ill. 2d 229, 240-44 (1986). While this relief has been called a "drastic measure," it is an appropriate tool to employ in the expeditious disposition of a lawsuit in which " 'the right of the moving party is clear and free from doubt.' " *Morris*, 197 Ill. 2d at 35, quoting *Purtill*, 111 Ill. 2d at 240. Appellate review of a trial court's grant of summary judgment is *de novo* (see *Outboard Marine Corp. v. Liberty Mutual Insurance*

19

*Co.*, 154 Ill. 2d 90, 102 (1992)), and reversal will occur only if we find that a genuine issue of material fact exists (see *Addison v. Whittenberg*, 124 Ill. 2d 287, 294 (1988)).

¶ 41    While plaintiff did not need to prove her entire cause during this stage of litigation, she was nevertheless required, as the nonmoving party, to present some factual basis and evidentiary facts to support the elements of her cause of action. See *Bellerive v. Hilton Hotels Corp.*, 245 Ill. App. 3d 933, 936 (1993). In other words, she was not entitled to rely on the allegations in her complaint in order to raise a genuine issue of material fact regarding lack of informed consent. See *CitiMortgage, Inc. v. Bukowski*, 2015 IL App (1st) 140780, ¶ 19; accord *Rucker v. Rucker*, 2014 IL App (1st) 132834, ¶ 49; see also *Winnetka Bank v. Mandas*, 202 Ill. App. 3d 373, 387-88 (1990) (she has a duty to present a factual basis which would arguably entitle her to judgment in her favor based on the law). This basis must recite facts and not mere conclusions or statements based on information and belief. See *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010); *In Interest of E.L.*, 152 Ill App. 3d 25, 31 (1987).

¶ 42    Ultimately, we find that there were no genuine issues of material fact remaining in this cause and, thus, that the trial court's grant of summary judgment was proper.

¶ 43    As we noted at the outset of our decision here, the exclusive focus of plaintiff's medical malpractice claim is based on an alleged lack of informed consent. Consequently, we, as do the parties, acknowledge that the *prima facie* elements of such a claim require a plaintiff to establish that (1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the plaintiff consented to treatment she otherwise would not have consented to; and (4) the plaintiff was injured by that treatment. See *Castillo v. Stevens*, 2019 IL App (1st)

172958, ¶ 21; accord *Xeniotis v. Cynthia Satko, D.D.S., M.S., P.C.*, 2014 IL App (1st) 131068, ¶ 51. These elements originate from the common law duty imposed upon doctors to inform patients of the foreseeable risks and results of a surgical procedure and the reasonable alternatives to that procedure. See *Xeniotis*, 2014 IL App (1st) 131068, ¶ 50 (physician must disclose risks that reasonable medical professional would have disclosed in similar circumstances). With respect to the first two elements, namely, what disclosures are required and whether the disclosure at issue was adequate, the law is clear that both of these must be shown by the presentation of expert medical testimony. See *Castillo*, 2019 IL App (1st) 172958, ¶¶ 22, 25-26 (informed consent law requires expert medical testimonial proof for both elements of duty/standard to disclose material risks and whether disclosure was adequate); accord *Xeniotis*, 2014 IL App (1st) 131068, ¶ 59, citing *Guebard v. Jabaay*, 117 Ill. App. 3d 1, 6 (1983) (there can be no liability absent proof by expert evidence of a failure to conform to the standard of care). If the plaintiff fails to provide expert medical testimony to support these two elements, her cause of action inherently fails and summary judgment is appropriate as a matter of law. See *Xeniotis*, 2014 IL App (1st) 131068, ¶ 75 (lack of such evidence amounts to the plaintiff's failure to state a claim for lack of informed consent); see also *Castillo*, 2019 IL App (1st) 172958, ¶ 27 (medical defendants must prevail where the plaintiff fails to present expert testimony regarding both elements to support claim of lack of informed consent).

¶ 44    In the instant cause, plaintiff failed to provide any expert medical testimony, from Dr. Mueller or anyone for that matter, with respect to either defendants' duty to disclose material risks for the enucleation procedure or that they deviated from the standard of care by failing to disclose or inadequately disclosing those risks to plaintiff.

¶ 45     With respect to the standard of care element, Dr. Mueller never stated what this was in relation to the circumstances of this cause. First, and foremost, Dr. Mueller testified that he was not a liver surgeon, had never performed this particular type of hemangioma surgery, and had never reviewed cases of enucleations such as this. Moreover, he specified in his deposition that his expert opinions in this cause were all contained in his section 2-622(a) Report. In that Report, he never mentions anything regarding the standard of care to which defendants were subject. Rather, therein, Dr. Mueller admitted he based his conclusions only on his discussions with plaintiff—not on a review of any depositions or any other medical information relevant to what occurred. Accordingly, and without ever using the term "standard of care," the closest mention Dr. Mueller makes regarding defendants' duty to disclose is his statement in his Report that a physician performing surgeries has an obligation to fully inform a patient of the attendant risks of the procedure and alternative treatments, if any. However, he never addresses what specific duty defendants, and especially Dr. Millis who performed the surgery, had here with respect to plaintiff's particular situation nor what material risks were at play in the enucleation procedure that he should have disclosed.

¶ 46     Similarly, Dr. Mueller also failed to discuss anything with respect to the standard of care and required duty during his testimonial depositions. Instead, he testified at length that, when it comes to a duty to disclose material risks, this is not required to be documented and doctors often discuss various aspects of the risks and benefits of surgery with patients that are not usually documented. He simply averred that the standard of care required a discussion of surgical risks, but not necessarily any documentation that it was had or what risks were presented, and, since he was not in attendance for plaintiff's consultation with defendant, he had no personal knowledge of what was said between the parties in this cause. The closest

22

Dr. Mueller ever came in rendering an expert opinion as to the duty to disclose during his depositions was when he was asked about incisional hernias and the size of surgical incisions. In this instance, he acknowledged that hernias were risks that should be disclosed to a patient, but these were low "down the list of significant problems" and, particularly in situations like plaintiff's where a hemangioma is life-threatening, more important risks to be disclosed are bleeding, recouperation, and irreversible damage. He further mentioned that not informing a patient about the anticipated size of an incision would be below the accepted standard of care, but at the same time, he refused to say whether the size of an incision increased the risk of developing a hernia or whether defendants informed plaintiff about any of this. Plainly put, Dr. Mueller offered no opinion as to what material risks of the enucleation procedure defendants needed to disclosed to plaintiff. Because of this, we cannot say there was any expert evidence establishing the standard against which defendants' disclosures were to be measured and, without this to support the first *prima facie* element of lack of informed consent, plaintiff's claim cannot survive.

¶ 47    Even were we able to conclude that plaintiff presented expert testimony establishing the applicable standard of care regarding what risks defendants had a duty to disclose, which we cannot since she did not, the record is clear that Dr. Mueller likewise did not offer any expert medical testimony with respect to the second element of lack of informed consent, namely, whether defendants' disclosures complied with that standard of care. In other words, there is simply no expert evidence to indicate that defendants, and Dr. Millis in particular, failed to disclose or inadequately disclosed the material risks of the enucleation procedure to plaintiff. In his Report, which again contained all his opinions in this matter, Dr. Mueller never spoke to this. Similarly, during his depositions, Dr. Mueller reiterated that he was not present

during any discussions between plaintiff and Dr. Millis and, accordingly, he refused to provide an opinion either way. In fact, Dr. Mueller specifically testified that there was nothing in his Report that should be interpreted as critical of Dr. Millis' techniques. And, the only opinion he did give was that, if plaintiff and Sheehan were to believed as to what Dr. Millis said during the September 2014 consultation, then defendants did not comply with the standard of care, but, if Dr. Millis and nurse Elkin were to be believed, then they did comply. Ultimately, Dr. Mueller essentially testified he had no opinion on whether Dr. Millis disclosed the material risks here, let alone whether his disclosure was adequate. Absent expert evidence on this element, just as the first, plaintiff cannot support her claim for lack of informed consent.

¶ 48    The instant cause is very similar to *Castillo*, a recent case before our Court that plaintiff attempts to distinguish and upon which defendants rely. In *Castillo*, the plaintiff brought a medical malpractice claim against the defendants asserting, in part, lack of informed consent with respect to a leg surgery they performed on her, following which she underwent a revisional surgery to correct (performed by a different doctor). See *Castillo*, 2019 IL App (1st) 172958, ¶¶ 4-5. This portion of her claim was disposed of by the trial court's grant of a directed verdict in favor of defendants, and on appeal, plaintiff asserted error upon the trial court, insisting she had presented sufficient expert evidence to meet the elements of lack of informed consent. See *Castillo*, 2019 IL App (1st) 172958, ¶ 15. We disagreed. Reaffirming, as we have herein, that both the standard of care element regarding disclosure of risks and the deviation element must be proven by expert medical evidence, and after noting that the plaintiff's expert established the applicable standard of care but provided no testimony regarding whether the defendants compiled or deviated from it, we held that

24

plaintiff could not make out her claim for informed consent. See *Castillo*, 2019 IL App (1st) 172958, ¶ 22.

¶ 49    Clearly, the instant cause mirrors *Castillo* and merits the same result. Indeed, the facts of the instant cause actually merit a holding in favor of defendants more so than in *Castillo*, since the plaintiff's expert in *Castillo* did at least provide medical evidence as to the duty to disclose element, whereas plaintiff here failed to provide any expert medical evidence regarding that element, as well as the deviation element of her cause of action.

¶ 50    We further cite *Castillo* to discuss a point plaintiff repeats often on appeal, that is, that Dr. Mueller's testimony was sufficient to defeat summary judgment here because, although it was based only on her and Sheehan's testimony, this was nonetheless a proper basis to create disputed issues of fact that were required to be sent to a jury. Plaintiff completely misses the mark with this assertion. Again, the elements of standard of care regarding disclosure of risks and whether this was met need to be proven by expert medical testimony. This is the law. See *Castillo*, 2019 IL App (1st) 172958, ¶¶ 22, 25-26; *Xeniotis*, 2014 IL App (1st) 131068, ¶ 59. As we noted in *Castillo*, a testifying expert not having been present during a consultation between a plaintiff patient and a defendant doctor would not, of course, have any firsthand knowledge of what, exactly, was said. However, as we explained, "[t]he point of the expert testimony on this issue is not to corroborate [the] plaintiff's testimony regarding what was or was not told to her ***. Rather, the point of expert testimony on this issue is to obtain an expert opinion on whether the warnings that were claimed to have been given satisfied the applicable standard of care." *Castillo*, 2019 IL App (1st) 172958, ¶ 23.

¶ 51    In the instant cause, contrary to plaintiff's insistence, Dr. Mueller's testimony was not at all sufficient to prove the elements of lack of informed consent. Of course, there is no doubt

that Dr. Mueller was not present during the September 2014 consultation between plaintiff and defendant Dr. Millis, which also included Sheehan and nurse Elkin. Likewise, there is no doubt that Dr. Mueller, as he admitted, had no firsthand knowledge of what, if any, disclosures of surgical risks Dr. Millis made to plaintiff or if these complied with the standard of care. However, as we noted in *Castillo*, this irrelevant. Plaintiff and Sheehan insist that defendant did not comply in that he never spoke of the risks of incisional hernias and quantifiably stated that the size of plaintiff's incision would be three inches long; Dr. Millis and nurse Elkin insist that he did comply in that he informed plaintiff of the risks of incisional hernias and physically demonstrated on her abdomen the length of the anticipated incision, which was longer than three inches and wrapped around from the bottom of her breastbone to the front of her rib cage. The very purpose of Dr. Mueller's expert testimony was *not* to corroborate plaintiff and Sheehan's testimony regarding what was or was not told to plaintiff by defendants. Rather, it was to obtain an expert opinion on what the standard of care required with respect to disclosure of risks was, and whether the warnings that were claimed to have been given complied with that standard.

¶ 52    Dr. Mueller's testimony fell quite short of this, contrary to what plaintiff promised via her pretrial supplemental disclosures and addendum. Again, Dr. Mueller admitted that his Report contained all his opinions; also admittedly, that entire Report was based solely on the discussions he had with plaintiff. This is exactly what we held in *Castillo* to be insufficient to support the elements of an informed consent complaint. Moreover, in his supplemental deposition taken after he reviewed the depositions given by other witnesses here, including Dr. Millis and nurse Elkin, Dr. Mueller specifically reaffirmed that his review of these "did not change, alter, or supplement" the expert opinions he previously disclosed in his Report in

any way regarding plaintiff's incisional hernia or the size and location of her incision. This testimony was obtained in direct opposition to the supplemental answer plaintiff provided to her Rule 213(f)(3) interrogatories, wherein she insisted that Dr. Mueller would now opine that Dr. Millis failed to provide her a full disclosure of the risks of the enucleation thereby deviating from the standard of care and that the enucleation was the medical cause of her incisional hernia. Dr. Mueller never provided such testimony, and certainly did not do so in his second deposition even after reviewing the additional depositions here. He further clarified that while plaintiff and her attorneys prepared the supplemental answer to her Rule 213(f)(3) interrogatories, he did not participate. Dr. Mueller's expert opinion remained the same throughout this cause—if plaintiff and Sheehan were to be believed, defendants deviated from the standard of care regarding disclosure, but if Dr. Millis and nurse Elkin were to be believed, defendants complied. Such an opinion is, essentially, no opinion, and certainly not one that would permit plaintiff's cause of action for lack of informed consent to survive summary judgment here in the face of the required elements, the first two of which she simply did not satisfy.

¶ 53    The same is also true of the third element in plaintiff's lack of informed consent cause of action. In her brief on appeal, she goes on to insist that, regardless of the other element of her claim, proximate cause is inherently a question of fact which, in and of itself, required the trial court to send her cause to a jury, particularly since she was not required to present any expert testimony related to this element. However, again, plaintiff's argument misses the mark, for several reasons.

¶ 54    Even assuming defective informed consent (which we have found she failed to establish), plaintiff, in order to prevail, was next required to establish the third element of lack of

informed consent, namely, proximate cause. See *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 53. This element describes that the resulting condition of which she complains, *i.e.*, her incisional hernia and the length and location of the incision which has left her with a permanent scar, must have been proximately caused by the absence of informed consent. See *Taylor*, 2011 IL App (1st) 093085, ¶ 53. In other words, she needed to establish that, as a direct and proximate result of defendants' failure to disclose the risks involved, she consented to treatment to which she otherwise would not have consented. See *Castillo*, 2019 IL App (1st) 172958, ¶ 21; accord *Xeniotis*, 2014 IL App (1st) 131068, ¶ 51. " 'The gravamen in an informed consent case requires the plaintiff to "point to significant undisclosed information relating to the treatment which would have altered her decision to undergo it." ' " *Taylor*, 2011 IL App (1st) 093085, ¶ 52, quoting *Davis v. Kraff*, 405 Ill. App. 3d 20, 29 (2010), quoting *Coryell*, 274 Ill. App. 3d at 546.

¶ 55        Plaintiff is correct that this third *prima facie* element, unlike the first two, does not require the presentation of medical expert testimony. See *Castillo*, 2019 IL App (1st) 172958, ¶ 24; *Coryell v. Smith*, 274 Ill. App. 3d 543, 546 (1995). However, she is wholly incorrect when she characterizes her burden as requiring her to demonstrate "whether she herself consented to the surgery to which she would not have consented." Rather, this third element is an objective standard. See *Castillo*, 2019 IL App (1st) 172958, ¶ 28; accord *Taylor*, 2011 IL App (1st) 093085, ¶ 53. Accordingly, while she was not required to present expert testimony, plaintiff was nonetheless required to demonstrate that a reasonable person—not "she herself"—would not have consented to the treatment at issue had the disclosure been adequate. See *Castillo*, 2019 IL App (1st) 172958, ¶ 28, citing *Guebard*, 117 Ill. App. 3d at 10 (" 'If disclosure would not have changed the decision of a reasonable

person in the position of the patient, there is no causal connection between nondisclosure and h[er] post-operative condition; if, however, disclosure would have caused a reasonable person in the position of the patient to refuse the surgery or therapy, a causal connection is shown' "). If she cannot show this, her claim must fail. See *Castillo*, 2019 IL App (1st) 172958, ¶ 28.

¶ 56     We return to for a moment to *Castillo* to illustrate these principles. Although having found that the plaintiff there failed to satisfy the second *prima facie* element of her lack of informed consent cause of action due to her failure to present the required expert medical testimony to show a deviation from the disclosure standard of care, our Court went on to address, apart from this failure, whether she had established proximate cause. See *Castillo*, 2019 IL App (1st) 172958, ¶ 27. We concluded that she had not. See *Castillo*, 2019 IL App (1st) 172958, ¶ 28. Acknowledging, as we have, that this does not require expert testimony, we nonetheless found that the "fatal flaw" in the plaintiff's case was that the record evidence she provided in support of her claim that a reasonable person would not have consented to the procedure at issue with adequate disclosure did "not shed any light on what a reasonable person might have done." *Castillo*, 2019 IL App (1st) 172958, ¶ 28. Instead, the evidence upon which she relied related only to what information was provided to her, and amounted to a conclusory statement that this constituted evidence that a reasonable person would not have gone forward with the surgery with the adequate disclosure of the risks. See *Castillo*, 2019 IL App (1st) 172958, ¶ 28. This was not enough. Without any substantive argument as to how what was or was not disclosed to her would have affected a reasonable person's decision to undergo the procedure, she could not meet the requirements of proximate cause to sustain a lack of informed consent cause of action. See *Castillo*, 2019 IL App (1st) 172958, ¶ 28.

¶ 57    The same has occurred in the instant cause. Yes, plaintiff was not required to present expert medical testimony regarding proximate cause, but she *was* required to show that a reasonable person in her position would not have consented to the enucleation had the disclosure been adequate. She did not. The evidence she provides in this respect does not shed any light on what a reasonable person might have done but, rather, relates only to what information she claims she was provided and results in her conclusory statement that this constituted evidence that a reasonable person would not have gone forward with the enucleation. She makes no substantive argument as to how what was or was not disclosed to her would have affected a reasonable person's decision to undergo the procedure. For example, plaintiff focuses her proximate cause argument on her insistence that, had defendants disclosed the risk of incisional hernias and the true length and location of the eventual scar, she would not have proceeded with the surgery and would have chosen instead Dr. Baker's laparoscopic procedure to remove her hemangioma. Not only does this fail to touch upon what a reasonable person would have done in her situation, as the objective standard requires, but it does not square up with much of the evidence presented in this cause.

¶ 58    Plaintiff admitted in her deposition, and again in her brief on appeal, that she knew, based on her several prior surgeries, of the risk of incisional hernias before undergoing the enucleation and that they could develop from either laparoscopic or open procedures. She also admitted that she understood, again before undergoing the enucleation, that laparoscopic procedures sometimes need to be converted into open procedures, requiring bigger incisions, during surgery. Clearly, then, regardless of whether, or what, defendants informed her, plaintiff knew about the potential for incisional hernias as well as scars. Additionally,

30

Sheehan noted in her testimony that plaintiff, not defendant Dr. Millis, was the one who brought up the potential for a bikini-line incision, which Dr. Millis clearly explained to plaintiff would be impossible and that the incision would be in her midsection near her sternum. Sheehan further noted that the reason plaintiff decided to proceed with the surgery was because the enucleation, as opposed to Dr. Baker's laparoscopy, aimed to minimize any removal of liver tissue along with the hemangioma and provided for a shorter recovery time so plaintiff could return to activities sooner, including drinking alcohol.

¶ 59      While this evidence shows plaintiff's motivation for her decision, it does not discuss how that evidence, or what else was or was not disclosed (like the length of the incision), would have affected a reasonable person in her position when considering whether to undergo the enucleation. Plaintiff neglects to discuss several key pieces of evidence here, evidence that would clearly be considered by a reasonable person in her position. For example, Dr. Baker offered plaintiff a laparoscopic procedure to remove the hemangioma in March 2012, when it was asymptomatic and her liver was exhibiting normal function. Plaintiff declined this procedure, and never returned to see Dr. Baker. That summer, following her colon surgery, Dr. Mueller advised her to consult again about the hemangioma, and recommended she return to Dr. Baker to have it removed. Again, plaintiff declined. Two years later, by September 2014 when she saw Dr. Millis, the hemangioma had grown to be grape-fruit size, had become life-threatening, and was causing considerable pain and pressure in her abdomen, with a significant threat of internal bleeding. Because of this, Dr. Millis made clear to plaintiff that he would only perform an open enucleation procedure, as he felt that removal could no longer be performed laparoscopically at this point. He told plaintiff that if she wished to have a laparoscopic procedure, she would need to see someone else.

¶ 60    This evidence is significant with respect to the proximate cause element. As plaintiff's own medical expert admitted, by the time plaintiff chose to undergo treatment, concerns like incisional hernias and the length or position of an incision or scar were low "down the list of significant problems;" her condition now presented a life-threatening situation. According to Dr. Mueller, more important risks to be considered were bleeding, recouperation, and irreversible damage. He also acknowledged that the development of incisional hernias could come with either a laparoscopic or an open procedure (which plaintiff said she knew), they could not always be controlled, and their occurrence was no indication that a doctor did not perform a procedure pursuant to the appropriate standard of care or that a patient did not follow postoperative instructions. As he intimated, unfortunately, they just happen.

¶ 61    Moreover, it would be remiss of us not to consider the dubitability of any suggestion that a grapefruit-sized mass located on one's liver could be removed via a single three-inch incision at one's bikini line, along with the testimony plaintiff and Sheehan both provided indicating that plaintiff never mentioned or complained about the size of the incision or scar to defendants, and only did so to Dr. Mueller after six months postsurgery. That plaintiff insists she would have chosen to undergo Dr. Baker's laparoscopy instead had these disclosures been made—after she rejected it twice before and for which she provides no evidence that it was even available to her two years later after her hemangioma had grown to become emergent—is untenable to establish the proximate cause element of lack of informed consent here. Instead, in light of the fact that the only presented alternative to undergoing defendants' enucleation procedure was continued abdominal pain and potential internal bleeding and/or death, disclosure of incisional hernias or an incision/scar greater than three inches—assuming these had not been given by defendants—would not have changed the

decision of a reasonable person in the position of plaintiff to undergo the enucleation. Accordingly, there is no causal connection between any alleged nondisclosure and plaintiff's postoperative condition.

¶ 62 Finally, we wish to briefly address one last item which plaintiff repeatedly mentions in her brief on appeal: the written consent form defendants presented to her and which she signed on the day of the enucleation. She insists that, since it identified a procedure other than that which was actually performed, it further supported Dr. Mueller's expert medical opinion that defendants deviated from the applicable standard of care with respect to informed consent. This is wholly incorrect. Dr. Mueller never testified in this manner and, quite frankly, any intimation otherwise to make the error in the written consent form at all relevant here amounts to nothing more than plaintiff's attempt to raise a red herring.

¶ 63 The first mention plaintiff ever made regarding the consent form was in her addendum to her supplemental answers to her Rule 213(f)(3) interrogatories, insisting that Dr. Mueller would now opine, after having reviewed additional depositions, that the consent form's inaccuracy was an additional deviation by defendants from the standard of care—which, as noted, she repeats again in her brief on appeal. However, and in direct contradiction to plaintiff's insistence, this is not at all what Dr. Mueller stated. In his supplemental deposition, Dr. Mueller discussed the consent form, as prepared by Dr. Hussain, noting that this was the only item of any difference that might affect his opinion in this matter. Yet, he then went on to testify at length that, while a signed paper form ideally "should match up" with the anticipated surgery, informed consent is much more than this. Dr. Mueller described that informed consent is not a document but a process, and one that begins long before the day of surgery, originating back to the first consultation between patient and

33

doctor and running throughout their multiple discussions—"a continuum" that begins in a doctor's office "the minute you start even talking about a surgery" and "continues on through as you have further discussions." Dr. Mueller also specifically went on to testify that there was no question here that plaintiff knew that the planned surgery was an enucleation and not a hepatectomy, and that this was, in fact, the surgery performed. He stated that any discrepancy in the paper consent form was simply "an error" and could actually be "throw[n] out" of consideration in this case, since Dr. Millis' operative report verified that he had an informed consent discussion with plaintiff and that plaintiff consented to the procedure. Consequently, and pursuant to plaintiff's own medical expert's testimony, the written consent form has no relevance to this cause, and certainly does not provide any basis, let alone a blanket one, for overturning this matter.

¶ 64                                    CONCLUSION

¶ 65        Ultimately, at the summary judgment stage, while plaintiff was not required to prove her entire case, she was required to present some factual basis to support the elements of her cause of action. In a lack of informed consent malpractice claim, this required that she present expert medical testimony to establish both the standard of care with respect to the disclosure of risks and that defendants failed to disclose or inadequately disclosed those risks. Plaintiff did not present such medical expert testimony and, even if she had, she did not objectively show that, as a proximate result of the failure to disclose, she consented to the enucleation surgery when she otherwise would not have, thereby failing to satisfy the elements of her cause of action.

¶ 66        Accordingly, and for all the foregoing reasons, we affirm the judgment of the trial court.

¶ 67        Affirmed.